It will begin with Mr. Simms. If you'd like to approach, you may begin. Your Honor, let's start with the CBA and the SEA. The Siemens contract, the court was wrong. The SEA incorporates the CBA and vice versa. The SEA has a choice of law clause, the law, the flag, Liberia. Let's start with that. If the plaintiff's suing on the SEA and the CBA, Liberian law controls under many precedents of this court of choice of law. But that gets us directly into Liberian law, and I want to go right to there's a bunch of ships that come to the U.S., therefore, U.S. law must apply. Well, Lauritsen takes that right on, and that is the central problem, the problem of overlooking the law, the flag here, Liberia. And in Lauritsen, at page 22, the law, the forum, which gets the district court to the U.S. law here, Lauritsen says, the doing business, which is enough to warrant service of process, may fall quite short of considerations necessary to bring extraterritorial torts to judgment under our law. Why is that? Because the law of the flag determines the law of the location, and in this case, it was on the ship, and the district court overlooks that, too. The district court says, well, the injury was somewhere in the ocean, okay? And where was the seaman here? On the ship. And what law applies to the ship? Liberian law, Liberian flag. That's where he was injured. That's where Lauritsen says the question begins and it ends, focusing on the law of the flag. Otherwise, the only way you can overcome the law of the flag, of course, is if there is some substantial United States connection that gets us to the law of the United States with this problem. Well, there wasn't, for a lot of reasons, but let's start with the fact that there was never any finding of fact confirming that there was any negligence involved in the United States. Now, that's not this court's test. It is where the injury happened. Well, the injury happened aboard ship, or here's where it probably happened. Where it probably happened, refer the court to record 5483, which is a nice social media picture of our plaintiff sitting in a bar in Owendo, Gabon, in short sleeves, supposedly terrified of mosquitoes, supposedly having had no available antimalarial medicine. Well, there he is enjoying a nice beer in the bar in Owendo. The injury did not happen in the U.S. The United States has no interest in regulating whether the court sleeves in a malaria infested place to have a nice beer with his friends has nothing to do with it. And in fact, there was no factual finding, again, that there was any lack of malarial medicine aboard the ship. In fact, as we came up procedurally to the question, at best, there was a summary judgment argument. There was a material difference of fact about whether there was enough antimalarial medicine on the ship to take care of the crew. Well, the evidence that EPS presented was that there was ample antimalarial medicine. And in fact, the plaintiff's own expert said that the plaintiff told him that he got antimalarial medicine as he was going on his way from Columbia to Gabon. And that's the other thing. Well, why doesn't Columbia have a greater interest here? Why are we talking about Columbian law? You can certainly put antimalarial medicine on in Columbia. You could certainly put it on in Gabon. But the point is that the fundamental finding the district court to look to U.S. law is flawed in two respects. First, it runs over this court's controlling test that the place of the injury is what controls. It's not the place of the negligence. But there was no factual finding that there was even any negligence here. Okay. Let me go back to the law of the flag for a second. So your friends on the other side point to our en banc decision in Coates, where in Coates we say MIS is not a shipowner and therefore this flag factor has no specific application to it. So I'm curious, what is your way of reconciling your reliance on law of the flag, which this is not an unfriendly question. I'm sympathetic to your position. I'm just trying to understand how you reconcile law of the flag, law of the flag, law of the flag with what we said in Coates. Well, what the court said in Coates was there were a number of different ships that Mr. Coates served on. One of them was the United States flagged ship. And in fact, the injury happened in the United States. It was a brown water case. And so, no brainer, brown water case. But if you then look at some of the other cases. I'm sorry, I don't mean to interrupt. I just want to pause you because I want to kind of walk through it slowly. So one way we could say Coates was a brown water case, and there's some support in that. The immediately preceding page, so I was reading to you from 1120, and in 1119, Coates has in this long series of parenthetical citations on the immediately preceding page of how it's talking about the Lewis and Rhoditis factors, it says distinguishes brown water and blue water cases. So I think maybe that's fair. But I guess my next question is, do we have other, have we ever distinguished Coates by saying that only applies in brown water circumstances? I don't know. I'm not saying it's unfair. I'm just asking if we've done it. I don't know. But when I look at Coates, I say this is a no brainer. The injury happened in the United States. The court was laboring over, or the defendant's side was trying to say, well, look, there's all these other flags. And the court says, well, I don't know what the other flags were, but here's one. It's the United States. And by the way, you were injured here. But if you look at the Chiazar case, okay, question about whether Nigerian law controls, no brainer. The ships ran into each other in Nigeria. Done. Game over. Or the Crittis case, the same thing. Another Nigerian collision. The same thing. Here, you don't even have any, any US connection. None. No base of operations, so it's not rhoditis. You have no witnesses here. The plaintiff never even has set foot in the United States. When we had our preliminary injunction hearing, the lower court let him testify remotely. Didn't make him come here. Now, where is the, if there's not enough US interest to require the plaintiff who brings a case in this court to show up, how can you say that US law can control? Now, the US law that the plaintiff is trying to invoke is the Jones Act. Okay. The Jones Act is only a suit against one's employer. Okay. Well, how did the plaintiff get employed? Through the Seaman's contract. That's the only way he gets paid. That's the only way he benefits from the CBA. Seaman's contract, Liberian law, again, points to that. The plaintiff backs off or drifts, if we remember an opinion that was added to Douglas at the end, drifts from the initial ship owner, whatever. Well, okay. The complaint is what it is. Paragraph three. But Lauritzen does not turn on whether or not the ship owner was sued. Lauritzen turns on international law, which says that the ship is the land of the flag that it operates under. And so where's the injury? On the ship. Okay. Where is the regulation of the Seaman? Liberian. Why did the Seaman have to have these articles? Under Liberian law. And when Liberian law is applied, it's very clear that yes, he does have some rights, not the same of the United States, certainly not the same as under the Jones Act, which would give him a jury trial, big difference, which would give him rights through the FVLA because Jones Act incorporates the FVLA, all sorts of procedural damages, proof rights of the FVLA. So it's different. There is a difference and it does make a difference. So no finding doesn't even get us to negligence happening in the US. So let's look at this place of injury. Okay. Even if, big even if, you're looking at negligence. Well, why again, aren't we looking at Columbia? It is in the record. The plaintiff testified. He knows he went to Columbia. There was no cargo even from Savannah to Columbia. Cargo got loaded in Columbia. If you're going to load antimalarial medication, parenthetically, you didn't have to because there was plenty. Why in the world couldn't it be, why don't you look at Columbia as the problem? Okay. But it's a separate voice. So there's really no US interest here. There is a injury. Liberia, Liberia, Liberia. You have the, of course, allegiance to the injured worker. Now, the only way that the contract could have been signed under Indian law was through the agent in India, which it was. It wasn't a fortuity. The plaintiff wasn't just hanging around the port in Morocco saying, hey, can I get on your ship? No. It was planned. He had to have a contract. EPS India flew him to Morocco where he joined the ship. He got on a ship, went to Ivory Coast, was very aware of antimalarial things. He took him all the way from Ivory Coast back to Savannah, and that is the only way he got on the ship, though, in India, an Indian plaintiff governed by Indian law. So, so far, if you're wondering, where's the US law here? There is none. Okay. And then let's talk about Singapore. So EPS, unquestionably a Singapore corporation. And so the plaintiff says, well, you know, you were really my employer. Okay. Great. Then tell me why US law comes in here and not Singapore law as the employer? Why doesn't Singapore as the employer have a greater interest than the US in this? Of course they do. And so does India. And so does Liberia. But the US has no interest. And back to Lauritzen. Lauritzen is, is very clear from a, from a, if you want to be originalist down to the, what was going on at the time of the revolution, looking at admiralty, the law of the flag control. Why? It was a matter of international sovereignty, international sovereignty. And so Lauritzen is very concerned about one country asserting its, its privacy of law over another country, unless there's something overwhelmingly important. For example, if there was a problem with the ship in the port, if it was dumping pollutants in the port, then the US law would apply. If, if bad food was being delivered to the ship, then there'd be somebody liable in the US, but that's not the case here. Not the case here. No US connections. I'll stop. Reserve for rebuttal. Thank you, Counsel. You have reserved five minutes for rebuttal. We'll hear from Mr. Martin now. Good morning. Members of the Court, I'm Richard Martin. I have the privilege of representing Mr. Cole-Carr on this matter. Thank you for allowing me to present oral argument on his behalf today. Judge Morgan, the district judge below, correctly reasoned that when a single party, here a vessel manager, is named as a defendant, some of the Lauritzen-Roditas factors don't apply. Others apply with less weight, and additional non-enumerated factors may be considered. EPS has not shown in any way, shape, or form that Judge Morgan abused her discretion. We're here because Judge Morgan sensibly said, I don't want to have to try this case twice, and she herself brought the issue of the choice of law up and sent it to this Court. It's not the parties. The district judge did it because she's very careful, she's meticulous in her opinions, and she wanted to get it right, and I'll suggest to this Court that she did. We were here in oral argument last year in front of a panel, three-judge panel, we ended up on the injunction issue. We ended up with an opinion by Judge Ho, and on page nine of that opinion, he said, this is just, the background of this is a garden variety choice of law argument going on. That's what Judge Ho thought, and I would suggest to the Court that that's what this is. I believe the Jones Act applies. There are good reasons why, and when you look at a choice of law analysis under Lauritzen, the inquiry into cases under the Jones Act, if it's asserted, is that Lauritzen wants to effectuate the Jones Act's liberal purposes, and that's Roditas. That's what it says, and interestingly enough, in Roditas, the Supreme Court was troubled by situations in which companies attempted to shield themselves from Jones Act liability by setting up shop in foreign countries, all the while making hundreds of port visits to the United States. Does that sound familiar here? To avoid such an outcome, the Supreme Court instructed courts that they must keep in mind the need to effectuate the liberal purposes of the Jones Act, and that is what Judge Morgan has done. Now, before we got here, for a year, all we heard about out of EPS was how Indian law applies. Well, they even sued my client in India. That case has been dismissed with prejudice, so that doesn't exist anymore over there, but only until we were on our march to this In fact, while we were before the district court, EPS only mentioned Liberia once in passing when it cited the second Roditas factor. Now, all of a sudden, it's Liberia, Liberia, Liberia, clearly changing horses in the middle of the race. Now, I'm prepared to argue any one of the eight factors. I think I've set them forth in my brief. One thing I did want to talk about was there's a distinction between the place where an injury is manifest and the place where the negligence occurs causing that injury, and what Judge Morgan did in her opinion was distinguish between the two. I can negligently discharge a firearm out that window and half a mile away it'll hit someone, placing the injuries on the other side of I-10, but the negligence is here, and clearly when you look at the Loretz and Roditas factors, those are not exclusive. They are illustrative, and clearly there are additional factors that can be considered, and one of the factors that Judge Morgan considered was where did the negligence occur? We know what happened in Savannah. I've cited it in my brief. For example, one of the exhibits is a May 12, 2017 email from the captain of the ship to EPS. Our malaria medicine for all of 2017 was supposed to have been delivered in Savannah. We still don't have it. That's negligence, and also what's interesting is when you talk about the case, it's about time periods. It's not about a voyage or a leg of a voyage. My client signed on for 11 months. The medicine that was supposed to be delivered on board according to that email was for an entire calendar year, and they needed to have it because their sea chest, their medicine chest required that medication, so Judge Morgan found, well, that's really significant. She also found that this company is not a casual visitor to the United States. I attached to these exhibits a printout from about one year showing over 400 visits, including dozens of visits to ports in Louisiana. This has gone on since then. My office is across the street. I can, on the 17th floor, I can look out the window and see EPS ships going up the river. They have a blue and yellow stack marking on them. Looks like a Ukraine flag. You can't miss them. They're here all the time. The judge also felt that those series of constant contacts in America spoke for U.S. jurisdiction and law. Also, something the judge didn't address, but which is important, is that when that medicine was not delivered on board, that vessel was and remained unseaworthy until it did, so that is an unseaworthiness in a U.S. port. That's an additional factor, and there is a great case out of late Judge Stanwood Duvall called Steward v. U.S. and it's found at 571 Fed Sup, 478, the 2008 case, where one of those U.S. NS vessels that's parked down in Araby, the big gray ones, one of those went to sea without insulin, which was on its required medical list. Judge Duvall tried the matter and found that the failure to stock the insulin and someone having an insulin problem on the boat rendered it unseaworthy, so that's an additional reason why U.S. law should apply because of the unseaworthy condition. Now, we also talked about the maritime contract, and it's really clear that the Seaman's Employment Agreement from December of 2016 is strictly and exclusively between my client and an outfit called Ventnor Navigation, and Ventnor is interesting. You look them up on the internet and you get Eastern Pacific, and they're a mailbox at 80 Broad Street in Monrovia. They have no office there. They have no employees there. That agreement says, this agreement shall be governed by and of ships flag aboard which the Seaman is employed. That applies to disagreements, employment disagreements, between Ventnor and Mr. Colcar, period. Now, there's separately a January 2015 collective bargaining agreement between the International Transport Workers Federation, the union of which my guy is a member, and Eastern Pacific, and what that says is this into the contract of employment, which means that the additional benefits or rights set forth in the union document apply to the relationship between Ventnor and my client, not my client and EPS. It is not a two-way relationship the way Mr. Simms has suggested. It's a one-way relationship. So, I would suggest that that's just a red herring argument. The malaria medication issue. Produced to us was the vessel's medical logbook for the prior voyage leg, whatever the court would like to describe it as, to Cote d'Ivoire, which is on the west on earth. And I've attached a copy of that medical log. You look through it, the second officer in meticulous detail documented every day that the crew members got their medicine. They go back to Savannah. The medicine's not delivered. There's another two documents, which are inventories, pre-Savannah and Brazil. The amount of medicines on board are identical, meaning nothing has been dispensed during that period. And curiously, the medical logbook has nothing whatsoever in it for the trip to Gabon from Savannah. Nothing. Now, what we've heard is, oh, they had their medicine. He took his medicine. The story of this case is that EPS has presented no evidence whatsoever that this ever occurred. In fact, their own expert physician, Rule 26 expert, Dr. Brown, said that the huge amount of parasites in the blood of my client when he finally got to the hospital in Brazil was so high that it was apparent he'd never been given any medication. They didn't give it to him on the way over. They didn't give it to him on the way from Gabon. They didn't have test kits. Dr. Brown also said a blood drop test kit in five minutes would tell you not only if you had malaria but also what type it was. He didn't have any of that. He had to be carried off the ship by two of his crewmates. He was in the hospital for 76 days. He was in a coma for two weeks. He lost almost all of his toes. He's got hip necrosis. He needs a new hip. He had eyesight damage. He had brain green, but yet if you listen to EPS, well, he lost a couple of toes. This case is full of evidence that this man never got medicine that was supposed to be delivered in Savannah and it never was a haphazard attitude, I guess, towards the safety of the crew members, but what that boils down to is negligence and unsavoriness in a U.S. port by a company that comes here hundreds of times a year to the United States. Judge Morgan correctly said, I can look at additional factors beyond law of the flag, residence of the plaintiff, residence of the defendant, the usual test in Lawrenson. What she did was not an abuse of discretion and therefore her finding that U.S. law should apply under the specific circumstances of this case was entirely appropriate and it should be affirmed and I would be pleased to answer any questions the court may have. Anybody? Thank you. Thank you, counsel. All right, Roberto. Well, you just heard why Lawrenson is critical here because Lawrenson focuses on the concerns of the ship, the concerns of the crew, the concerns of the flag state for that aboard its jurisdiction, including the question of unseaworthiness. This ship was regulated according to Liberian law, Liberian requirements of meeting the medicine chest. Our expert testified that everything was there. The plaintiff was the only one not to contract malaria, the only one to the at the very best. We have a dispute of fact about whether there was negligence in the U.S., but we have no dispute of fact on the question of where the injury occurred. No dispute of fact that our plaintiff was sitting in that bar having a nice beer in short sleeves in the middle of this mosquito infested place. No dispute about the fact that the injury took place on a Liberian flagship, Liberian soil, Liberian regulated. No dispute of fact about that. This Seward case, well, it's an American flagship for Pete's sake. No wonder U.S. law applies. And that's not even the opposite. Again, the medicine log, we can argue back and forth on that, but that's not where the court can, the district court should have come out saying, I believe that there wasn't antimalarial on the ship, therefore there was negligence, which is not even this court standard. You can't turn choice of law in that, especially where you go back to Luritz and you say, is there an overriding U.S. interest in the issue? Okay, we can argue back and forth. You can argue back and forth. That the law of the flag controls, that is what gives predictability in admiralty law, which is a central principle in admiralty law, a central principle. So, Liberian law applies. That's the rebuttal. Thank you, counsel. Appreciate your arguments today and your briefing in this matter. The case will be considered submitted.